# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| EDGAR PAL, individually and on behalf of all others similarly situated, | Case No. 1:26-cv-01228 |
| *Plaintiff,* | |
| v. | **CLASS ACTION COMPLAINT** |
| ATHLETICO MANAGEMENT, LLC, a Delaware limited liability company, d/b/a ATHLETICO PHYSICAL THERAPY | **DEMAND FOR JURY TRIAL** |
| *Defendant.* | |

Plaintiff Edgar Pal at all times relevant herein, has been a patient of Athletico Management, LLC ("Athletico" or "Defendant"), and brings this class action against Defendant in his individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions, his counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this case to address Defendant's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including, Google Inc. ("Google"), without consent, through the use of tracking software that is embedded in Defendant's website.

2. Defendant owns and controls www.athletico.com ("Defendant's Website" or the "Website"), which it encourages patients to use the Schedule Appointment function, research providers and locations, communicate what medical or physical concerns they have, registering

for the patient Portal MyAthletico, make payments, fill out medical consent and registration forms, and more.

3.      Included within Defendant's Website is the MyAthletico patient portal ("Patient Portal") which Defendant encourages patients to register for and use so that they can more conveniently book appointments and schedule visits, review their health records, pay bills, and provide additional medical information.

4.      Unbeknownst to its patients, Defendant installed tracking technologies ("Tracking Tools") onto its Website, including the Patient Portal registration page on Defendant's Website that navigates to the login page for the Patient Portal. These Tracking Tools transmit personally identifiable information ("PII") and protected health information ("PHI") (collectively "Private Information") to third parties entirely without the patients' knowledge and consent.

5.      Although Plaintiff is presently unaware of every type of Tracking Tool Defendant deployed on its Website and patient portal during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third-party that: (1) has not executed a HIPAA-compliant business associate agreement with Defendant; and (2) for which patients did not execute a HIPAA-compliant marketing authorization.

6.      As used herein, Tracking Tools includes Google Analytics, the Google Tag Manager, and similar tools offered by Google in conjunction with its marketing products and other platforms (such as "DoubleClick").

7.      These Tracking Tools intercept, record, and disseminate patients' communications with Defendant via its Website. Operating as designed, the Tracking Tools commandeer patients' web browsers and surreptitiously disclose their private communications to Google and/or other third parties as Plaintiff and other patients use the Website.

2

8. Plaintiff and the Class members used Defendant's Website to browse medical issues and treatments and submitted information related to their past, present, or future health conditions. Such Private Information would allow the third parties (e.g., Google) to know that a specific patient was seeking confidential medical care from Defendant. This disclosure would also allow third parties to reasonably infer that a specific patient was being treated for specific types of physical therapies.

9. The information collected and disclosed by Defendant's Tracking Tools is not anonymous. For example, Google connects patient data from Defendant's Website to the individual patient's Google Account via numerous trackers such as their cid and other persistent identifiers which are linked to his/her Google account and contain additional details about their identity.

10. Additionally, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[1]

11. Simply put, the health information disclosed through the tracking technologies is personally identifiable.

---

[1] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 29, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

12. Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express, written authorization.

13. Despite its legal and ethical duties to protect patient information, Defendants undermined the importance of safeguarding the identities and personal medical information of individuals seeking Physical Therapy services and breached its patients' trust—violating federal and state law, including the Health Insurance Portability and Accountability Act ("HIPAA") and the Illinois Personal Information Protection Act ("PIPA").

14. In addition, as explained further below, HHS has specifically warned healthcare regulated entities that tracking technologies like those used by Defendant transmit personally identifying information to third parties, both on the public portion of the website and within the password-protection patient portal, and that such information should not be transmitted without a HIPAA-acceptable written authorization from patients.

15. The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

16. Despite these clear laws and regulations, Defendant has essentially planted a bug on patients' web browsers, which forcibly and invisibly discloses their private and confidential

communications with Defendant to Unauthorized Parties. This is the electronic equivalent of looking over the shoulder of each visitor for the entire duration of their Website interaction.

17. Defendant did not disclose the presence of these Tracking Tools to its patients and Website users.

18. Healthcare patients simply do not anticipate or expect that their trusted healthcare provider will send their private communications, PHI, or PII to unauthorized third [parties, let alone Google, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.

19. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Google.

20. Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*,: (i) aiding and/or procuring the interception of Plaintiff's and Class Members' communications; (ii) failing to remove or disengage technology that was known and designed to share patients' information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Google, or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like Google Analytics; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

21. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

22. Plaintiff seeks to remedy these harms and brings causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (3) invasion of privacy; (4) breach of implied contract; (5) unjust enrichment; and (6) negligence.

## PARTIES

23. Plaintiff Edgar Pal is a natural person and citizen of the State of Illinois.

24. Defendant Athletico Management LLC is a professional limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 2122 York Road, Oak Brook, IL 60523.

25. Athletico owns and operates a network of 900 clinics throughout 24 states and the District of Columbia. Defendant has been in business for over 30 years.

26. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION AND VENUE

27. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

28. This Court has personal jurisdiction over Defendant because Defendant conducts business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District.

29. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Plaintiff and the Defendant both reside in this District and a substantial part of the events or omissions giving rise

to Plaintiff's claims occurred, in a substantial part, in the District.

## COMMON FACTUAL ALLEGATIONS

**A. The U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers**

30.     In January 2013, HHS issued a final rulemaking notice regarding modifications to the HIPAA privacy, security, enforcement, and breach notification rules under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") to "strengthen the privacy and security protection for individuals' health information." 78 Fed. Reg. 5566 (January 25, 2013).

31.     As part of that final rulemaking, which became effective on March 26, 2013, HHS stated that, to be considered protected health information (PHI) under HIPAA, information did "not necessarily [need to] include diagnosis-specific information, such as information about the treatment of an individual." 78 Fed. Reg. at 5598. Instead, "[i]f the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules." *Id.*

32.     In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[2]

---

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-

In other words, the HHS has expressly stated that entities like Defendant implement Tracking Tools such as Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

33.     The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*** [3]

34.     Additionally, HHS has warned healthcare providers that Protected Information is not limited exclusively to patient portals like MyChart, and thus Defendant still has an obligation to protect information on non-password protected (i.e., "unauthenticated") webpages. Citing to the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."[4]

35.     The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. ***For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.***[5]

---

online-tracking/index.html (last visited June 18, 2023) (emphasis added).

[3] *Id.*

[4] *Id.*

[5] *Id*. (emphasis added)

36. In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[6]

33. Defendants' conduct is also contrary to the privacy and confidentiality protections guaranteed by Illinois's Medical Patient Rights Act ("MPRA"), 410 ILCS 50/3(d), and Personal Information Protection Act ("PIPA"), 815 ILCS 530/5.

34. The MPRA protects Plaintiff's and putative class members' medical information from unauthorized disclosures and provides:

> Each physician, health care provider, health services corporation and insurance company shall refrain from disclosing the nature or details of services provided to patients, except that such information may be disclosed: (1) to the patient, (2) to the party making treatment decisions if the patient is incapable of making decisions regarding the health services provided, (3) for treatment in accordance with 45 CFR 164.501 and 164.506, (4) for payment in accordance with 45 CFR 164.501 and 164.506, (5) to those parties responsible for peer review, utilization review, and quality assurance, (6) for health care operations in accordance with 45 CFR

---

[6] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed. Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

> 164.501 and 164.506, (7) to those parties required to be notified under the Abused and Neglected Child Reporting Act or the Illinois Sexually Transmissible Disease Control Act, or (8) as otherwise permitted, authorized, or required by State or federal law. This right may be waived in writing by the patient or the patient's guardian or legal representative, but a physician or other health care provider may not condition the provision of services on the patient's, guardian's, or legal representative's agreement to sign such a waiver.

410 ILCS 50/3(d).

36. PIPA protects Plaintiff's and putative class members' medical information and personal information from unauthorized disclosure.

37. Defendants are "Data Collectors" and subject to the provisions of PIPA.

38. PIPA provides that:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those record from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/459(a).

39. Both state and federal law protect the PII and PHI that Defendant disclosed to third parties like Google.

**B. Underlying Web Technology**

37. To understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

38. Devices (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

39.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

40.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[7]

---

[7] One browsing session may consist of hundreds or thousands of individual HTTP Requests and

11

41.     Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

42.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Source Code, thereby instructing the Website to send a second set of transmissions to Google's own web servers.

43.     By contrast, the Markup is the façade of the website, and it is the only part that website visitors actually see when they access a website.  As an example, a patient's HTTP Request seeks specific information from the Defendant's Website (e.g., "Schedule Appointment" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

44.     Similarly, when a patient visits https://athletico.com and selects the "Schedule Appointment" button, their web browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage. As depicted below, patients only see the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

---

HTTP Responses.

12



*Figure 1: A screenshot taken from the user's web browser upon visiting https://www.athletico.com/patients/request-appointment/ (last accessed January 26, 2026).*

45. The image above displays the homepage of Defendant's Webpage. Behind the scenes and in the backdoor of the webpage, tracking technologies like the Google Analytics tracking tool are embedded in the Source code, automatically transmitting what the patient does on the webpage and effectively opening a hidden spying window into the patients' browser.

## C. Tracking Tools

46. Third parties, like Google, offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

47. In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc. Advertisers, such as Defendant, can track other user actions and communications and

13

can create their own tracking parameters by customizing the software on their website.

48. When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Tracking Tools on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to the third parties servers.

49. Google Analytics tracks what a user communicates to Defendant's website.[8]

50. Notably, transmissions only occur on webpages that contain Tracking Tools.[9] Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Google via this technology but for Defendant's decisions to install the Tracking Tools on its Website.

**D. Defendant Disclosed Plaintiff's and Class Members' Private Information to Google Using Tracking Tools**

51. In this case, Defendant employed various Tracking Tools from Google, such as the Google Analytics tool, to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Google.

52. Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

---

[8] *Comparing Google Analytics vs Facebook Pixel*, Boltic, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20your%20website. (last visited Jan. 26, 2024)

[9] Defendant's Google Analytics Tool has its own unique identifier (tid: G-XXB1DT59BP), which can be used to identify which of Defendant's webpages contain the Google Analytics Tracking Tool.

53. Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

54. The Tracking Tools allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Tracking Tools in order to function.

55. While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

56. Plaintiff and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

57. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

58. Defendant's Tracking Tools sent non-public Private Information to third parties like Google, including but not limited to Plaintiff's and Class Members': (1) status as medical patients; (2) health conditions; (3) desired medical treatments and therapies; and (4) desired locations or facilities where treatment was sought.

59. Importantly, the Private Information Defendant's Tracking Tools sent to third parties included personally identifying information that allowed those third parties to connect the Private Information to a specific patient. Information sent to Google was sent alongside the

15

Plaintiff's and Class Members' Google Account identifier (CID), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[10]

60.     Similarly, Google users who are logged in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.

61.     Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

62.     In addition to these personally identifiable persistent identifiers, upon receiving information from Defendant's Websites, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

63.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

64.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they

---

[10] Brown v. Google LLC, Case No. 4:20-cv-3664-YGR, FN11 (quoting Google employee deposition testimony explaining how Google tracks user data).

have installed to generate a unique identifier which can then be used to match a user across websites."[11]

65. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[12] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

66. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

67. Browser-fingerprints are personal identifiers. Google Analytics and other Google tracking tools can collect browser-fingerprints from website visitors.

68. As enabled by Defendant, Google collects vast quantities of consumer data through Google Analytics.

69. Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, it intercepts and links such information to an individual's specific identity.

70. Google then utilizes such information for its own purposes, such as targeted advertising.

71. By installing and implementing Google Analytics, Defendant caused Plaintiff's and Class Member's communications to be intercepted by and/or disclosed to Google and for those

---

[11] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

[12] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

13 Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndsssymposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

communications to be personally identifiable.

72.     As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

**E.   Athletico Violates Patient's Privacy Rights**

40.     Defendant Athletico owns and operates the Website www.athletico.com. Patients like Plaintiff and the Class access information about various medical issues and treatments offered by Athletico, information about Defendant's many locations, access to a patient portal, and the ability to schedule and pay for appointments and medical services.

41.     Defendant understands that information on the Website is protected and confidential as indicated by Athletico's "Notice of Privacy Practices" on its website, notifying patients of Athletico's obligations under the HIPAA.

42.     Contrary to the representations Athletico made on its Website and contrary to its obligations under HIPAA, Defendant disclosed and/or allowed third parties to intercept, in real time, confidential patient information from its Website. Indeed, Defendant Athletico embedded a host of trackers by Google on its Website, allowing Google to intercept sensitive details about their patient's confidential communications.

43.     Defendant Athletico allows patients to browse its Website and view discrete web pages concerning various medical issues and treatments offered by Athletico.

**F.   Defendant's Tracking Tools Disseminate Patient Information Via Its Website**

73.     Patients of Athletico believed that they were communicating *only* with their healthcare provider, but in reality, Athletico installed Tracking Tools and other technologies on its that collect and disclose confidential information to third parties like Google.

74.     Defendant's Website describes and explains the various medical services it offers

18

to patients. For example, Defendant created discrete pages for filling out registration forms, schedule appointment forms, free assessments, work injuries, and other specialized therapies.



*Figure 2: Image showing what services are offered by Athletico. (Last accessed Jan. 26. 2026).*

75.     Unbeknownst to ordinary patients, this particular webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Tracking Tools. The image below shows the "behind the scenes" portion of the website that is invisible to ordinary users. Importantly, each entry in the column represents just one instance in which Defendant's Tracking Tools sent this particular user's information to Google:



*Figure 3: Screenshot taken from https://www.athletico.com/patients/request-appointment/ which shows the markup(user facing portion of the website) alongside the network traffic. Each entry in the column to the right represents just one instance in which the user's information was transmitted to third parties, including Google via Defendant's tracking tools.*

76.     Thus, without alerting the user, Defendant's Tracking Tools send each and every communication the user made via the webpage to Google, and the images below confirm that the communications Defendant sends to Google contain the user's Private Information.

77.     The following image reveals what information is sent to Google, when the patient navigates to the schedule an appointment page.

20



*Figure 4: Screenshot of user's network traffic report while on the request physical therapy appointment page.*

78.     The first line of highlighted text, "tid:G-XXB1DT59BP" refers to Defendant's Google Analytics ID and confirms that Defendant has downloaded Google Analytics into its Source Code for this particular webpage.

79.     The additional lines of highlighted text show Defendant have disclosed to Google that the user: (1) is a patient requesting an appointment[14]; and (2) includes the CID that identifies the user based on their Google Account. Additionally, once the user has submitted their appointment request, Google tracks that event as depicted in the image below:

---

[14] It should be noted that there are various forms similar to the schedule appointment form, including to request medical records, consent forms, and new patient registration forms depending on the patients status. Google Analytics is embedded in every web page part of Defendant's Website.



*Figure 5: Screenshot of user's network traffic report after submitting appointment request.*

*Figure 6: screenshot of user's network traffic report depicting the "Payload" and corresponding "Headers" associated with the user's online activity and communications to Defendant.*

80.     In each of the examples above, the user's website activity and the contents of the user's communications are sent to Google alongside their personally identifiable information. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's CID and allows Google to link the user's online communications and interactions to their individual Google Account.

81.     After browsing services offered on Athletico's website, patients can select to "schedule appointment" and search for their nearest Athletico clinic. Doing so, allows Google to intercept, in real time, sensitive information about Plaintiff and the Class such as, the reason for

their visit, location where the patient is seeking treatment, and their status as a patient of Athletico.

Specifically, Google intercepts sensitive information about the patient such as their zip code and

geocoordinates where they are seeking treatment.

| dl | https://www.athletico.com/patients/request-appointment/ |
|---|---|
| dr | https://www.athletico.com/services/head-injury-and-concussion-management/ |
| dt | Request a Physical Therapy Appointment |

*Figure 7: image showing the information intercepted by Google revealing that a patient is requesting an appointment for a head injury.*

| dl | https://www.athletico.com/patients/request-appointment/?location=river-north |
|---|---|
| dr | https://www.athletico.com/search-locations/?address=Chicago%2C+IL+60654%2C+USA&lat=41.8929153&lng=-87.63591249999999 |
| dt | Request a Physical Therapy Appointment |

*Figure 8: image showing the information intercepted by Google indicating that a patient is requesting an appointment at its clinic located in River North, Chicago, Illinois.*

82.     Google's Tracking Tools on Athletico's Website also collect the exact and precise

search terms entered by the patient. For example, by searching for "back pain," Google

surreptitiously  intercepts the search terms in real time.



| dl | https://www.athletico.com/?s=back+pain |
|---|---|
| dt | You searched for back pain - Athletico |

*Figure 9: image showing information Google intercepted when the patient searched for "back pain."*

83.     Defendant Athletico allowed Google to not only intercept sensitive web browsing

activities that reveal patient's medical issues, but it also allowed Google to intercept Plaintiff's and

the Class's status as a patient of Athletico. As shown above, intercepting information that a patient

is seeking treatment at a specific Athletico location—including the reason for their visit—is

information that relates to the provision and/or payment of healthcare. Furthermore, Athletico also

allowed Google to intercept web browsing activities on its Website that reveal Plaintiff's and

Class's status as a patient when they, *inter alia,* visited patient specific pages such as the patient portal and payment portals.

| dl | https://www.athletico.com/securenet-2/ |
|----|----------------------------------------|
| dr | https://www.athletico.com/?s=back+pain |
| dt | Pay Your Bill - Athletico |

*Figure 10: Image showing information intercepted by Google indicating that a patient accessed a patient only bill payment page called "Pay Your Bill."*

84.    And finally, Defendant Athletico allowed Google to also intercept communications when the patient visited and downloaded various patient consent forms and/or registration packets.

| dl | https://www.athletico.com/patients/new-patient-registration/ |
|----|---------------------------------------------------------------|
| dt | New Patient Registration - Athletico |
| en | file_download |
| ep.link_id | |
| ep.link_url | https://www.athletico.com/wp-content/uploads/2025/10/09_12_25_PatientRegistrationPacket2025.pdf |
| ep.link_text | English Intake + Consent (PDF) |
| ep.file_name | /wp-content/uploads/2025/10/09_12_25_PatientRegistrationPacket2025.pdf |
| ep.file_extension | pdf |

*Figure 11: Image showing information intercepted by Google indicating that a patient downloaded a patient intake and consent form.*

85.    As discussed in depth above, Google intercepts the patient's website activity and the contents of their communications alongside their personally identifiable information. This personally identifiable information includes the "cid" or the client id along with various cookies that allow Google to link the patient's activity on the Website—and the internet in general—with an individual Google Account.

24

86. The NID cookie contains an encrypted Google Account ID and browser identifier.[15] Google, at a minimum, uses the NID cookie to identify users, and this particular cookie can stay on a user's website browser for up to 6 months to identify the users history on the website.[16]

87. The cookies listed above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Google. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of the Pixel throughout its website. Users can block cookies of this type by rejecting cookies when visiting a particular website.

88. Defendant also revealed its website visitors' identities via first-party cookies such as the _ga cookie that Google uses to identify a particular browser and a user:[17]

| _ga | GA1.1.367586316.1769704730 | .athletico.com |

*Figure 12: Screengrab from Defendant's network traffic report depicting the first party cookie _ga.*

89. Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID cookie the _ga cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.

90. Defendant Athletico embedded Google's trackers including the Google Analytics, Google Tag Manager, and DoubleClick on its Website. Athletico also incorporated Meta's

---

[15] Engineering at Meta: Meta Cookie Notice, https://engineering.fb.com/privacy/ (last visited Jan. 26, 2026).

[16] *Id.*

[17] *Id.*

Facebook Tracker that collects patient's website activity together with a user id corresponding with a patient's Facebook account.

91. In summation, Google at a minimum, uses the NID, _ga, and CID cookies to link website visitors' communications and online activity with their corresponding Google Accounts, and, because the tracking tools are automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Google even when they have disabled third-party cookies within their web browsers.

92. Plaintiff and the Class did not (and could not) give their consent for Athletico to disclose or procure other third parties to collect their sensitive behavior on the website that reveals their medical issues and status as a medical patient. The Tracking Tools embedded by Defendant were being surreptitiously operated and without the Plaintiff's the Class member's knowledge.

**G. Defendant's Conduct Is Unlawful and Violated Industry Norms**

Defendant Violated HIPAA Standards

93. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[18]

94. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[19]

---

[18]  HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[19]  HHS.gov, HIPAA For Professionals (last visited April 12, 2023), https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html.

95. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

96. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

97. Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

    a. Names;
       ***
    H. Medical record numbers;
       ***
    J. Account numbers;
       ***
    M. Device identifiers and serial numbers;
    N. Web Universal Resource Locators (URLs);
    O. Internet Protocol (IP) address numbers; … and
    R. Any other unique identifying number, characteristic, or code…;and"

The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

98.     The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

99.     An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

100.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

101.     Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

28

102.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[20]

103.    In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[21]

104.    As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[22]

---

[20]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 3, 2022).

[21]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Nov. 3, 2022)

[22] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

105.    The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

106.    Defendant's actions violated HIPAA Rules per this Bulletin.

### PLAINTIFF EDGAR PAL's EXPERIENCE

107.    Plaintiff Pal has been a patient of Athletico on and off since 2022.

108.    Plaintiff Pal has had a Google Account since approximately 2011.

109.    On at least one occasion, Plaintiff accessed Defendant's Website on his device to find and obtain medical treatment from Defendant. At the relevant time, Plaintiff Pal was logged into his Google account on the same device.

110.    Plaintiff used Defendant's Website to schedule an appointment and communicated Private Information, such as his specific medical issues and therapies he was seeking care for to Defendant. Most recently, he filled out a form to request a new appointment.

111.    Following his visits to Defendant's Website, Plaintiff observed advertisements on the internet related to the medical conditions and therapies he communicated to Defendant via its Website and the treatments he sought and received from Defendant.

112.    Pursuant to the systematic process described in this Complaint, Plaintiff's Private Information was disclosed to numerous third parties, and this data included his PII, PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

30

113. As Defendant's patient, Plaintiff reasonably expected that his online communications with Defendant were solely between himself and Defendant and that such communications would not be transmitted to or disclosed to a third party. But for his status as Defendant's patient, Plaintiff would not have disclosed his Private Information to Defendant.

114. During his time as a patient, Plaintiff never consented to the use of his Private Information by third parties or to Defendant enabling third parties, including Google, to access or interpret such information.

115. Accordingly, during the same transmissions, the Website routinely provides Google with its patients' CID, IP addresses, and/or device IDs or other information they input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients. Plaintiff's and Class Members identities could be easily determined based on the CID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

116. After intercepting and collecting this information, Google will associate the information that it collects from the visitor with a CID that identifies their name and Google Account, i.e., their real-world identity. A user's CID is linked to their Google Account, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details.

117. In sum, Defendant's Tracking Tools transmitted Plaintiff's highly sensitive communications and Private Information to Google, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

118. Defendant breached Plaintiff's right to privacy and unlawfully disclosed his Private Information to Google. Specifically, Plaintiff had a reasonable expectation of privacy, based on his status as Defendant's patient, that Defendant would not disclose his Private Information to third parties.

119. Defendant did not inform Plaintiff that it shared his Private Information with Google.

120. By doing so without Plaintiff's consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed Plaintiff's Private Information.

121. Plaintiff suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to his Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information he communicated to Defendant via the Website.

122. Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

123. Plaintiff Pal expected his communications with Athletico to remain private and confidential. He had no reason to know, nor could he, that unknown third parties would collect information about him. Needless to say, Plaintiff Pal did not give Athletico, Google, or any other third parties consent to collect, share, or otherwise disclose his Private Information.

32

**TOLLING**

124.     Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that his PII and PHI was intercepted and unlawfully disclosed to third parties because Defendant kept this information secret.

**CLASS ACTION ALLEGATIONS**

125.     Class Definition: Plaintiff Edgar Pal brings this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and a Class of others similarly situated, defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website and had their Private Information disclosed to a third party without authorization.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

126.     **Numerosity:** The exact number of Class members is unknown and not available to Plaintiff at this time, but upon information and belief it is at least several thousand. Individual joinder is impracticable. On information and belief, Defendant allowed unannounced third-parties to surreptitiously intercept Plaintiff's and Class member's electronic communications with their health care providers. Class members can be identified through Defendant's records.

33

127. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the proposed Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to, the following:

(a) Whether Defendant intercepted or procured any other person to intercept any of Plaintiff's and Class members' communications;

(b) Whether Google's and Meta's trackers are devices used to intercept Plaintiff's and the Class members' communications;

(c) Whether Defendant obtained consent from Plaintiff and the Class to intercept or procure another person to intercept their communications; and,

(d) Whether Plaintiff and the Class were injured by Defendant's conduct.

128. **Typicality:** Plaintiff's claims are typical of the claims of the Class members in that Plaintiff, like all Class members, has been injured by Defendant's conduct.

129. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class. Plaintiff and the Class members sustained damages as a result of Defendant's conduct. Plaintiff also has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to the Class.

130. **Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is

impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

## CLASS ACTION ALLEGATIONS

### COUNT I
### Violation of the Federal Wiretap Act
### 18 U.S.C. § 2510 *et seq.*
### (On behalf of Plaintiff and the Class)

131. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

132. The Federal Wiretap Act creates a private right of action against any person who "intercepts . . . or procures any other person to intercept . . . any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

133. By integrating tracking code on its website, Defendant allowed third parties, such as Google, to intercept, or procured third parties to intercept, the content of an electronic communication.

134. The descriptive URLs and names of web pages Plaintiff and the Class requested from Defendant is "content" of an electronic communication.

135. Defendant's actions were intentional. On information and belief, Defendant knew the capability of the Tracking Tools and implemented its eavesdropping features on its website.

136. The Tracking Tools are an "electronic, mechanical, or other device" that is used to intercept Plaintiff's and Class member's communications with their Defendant's websites.

137. Plaintiff and the Class members did not consent to having their wire and/or oral

35

communications intercepted and analyzed by anyone—let alone an unknown third-parties.

138.    Worse yet, the Unauthorized Parties and their Tracking Tools were not announced parties to the communication between Plaintiff and the Class members and their medical provider. Defendant allowed them to intercept Plaintiff and the Class members' communications for the purposes of violating 42 U.S.C. § 1320d-6 of the Health Insurance Portability and Accountability Act ("HIPAA").

139.    HIPAA § 1320d-6 imposes federal criminal liability to anyone who obtains "individually identifiable health information" (or "IIHI") relating to an individual, or discloses it to another person.  IIHI is any information that:

> (A) is created or received by a health care provider . . . and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6).

140.    As alleged above, Plaintiff and the Class are past, present, and future patients or potential patients of Athletico inquiring about the provision of medical care services.

141.    The Google Tracking Tools either directly identifies Plaintiff and the Class and/or there is a reasonable basis to believe that the information can be used to identify Plaintiff and the Class.

142.    Specifically, Google associates each Google Identifier with a specific Google user, and as such the Google Identifiers identify the Plaintiff and the Class.

143.    Indeed, the 18 HIPAA identifiers include, as relevant here, account numbers, device identifiers, and URLs. The Google Tracking Tools include identifiers that correlate with a Google account number, respectively, include device identifiers such as the operating system and browser

information, and the URLs that Plaintiff and the Class accessed.

144.     Plaintiff and the Class have suffered harm as a result of Defendant's violation of the Federal Wiretap Act and now seek statutory damages of whichever is the greater of $100 a day for each day of violation per Class Member or $10,000 per violation per Class Member pursuant to 18 U.S.C. § 2520(c)(2)(B).

## COUNT II
## BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
### (On Behalf of Plaintiff and the Class)

145.     Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

146.     Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

147.     Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

148.     In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third

37

parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

149. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

150. These disclosures were made for commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

151. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under those policies and procedures.

152. The third-party recipients included, but may not be limited to, Google. Such information was received by these third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

153. Defendant's breach of the common law implied covenant of trust and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

   a. By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

   b. By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI;

e. By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g. By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

h. By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. By otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

154. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure to private information and erosion of the essential confidential relationship between the healthcare provider and the patient.

155. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

39

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class members have in their Private Information.

**COUNT III**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

156. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

157. Plaintiff and Class Members have a statutory privacy interest in their names, portraits, pictures, and voices under Illinois Law

158. Defendant knowingly used Plaintiff's and Class Members' names and other Private Information in the State of Illinois for advertising and trade purposes without first obtaining their written consent.

159.     Specifically, Defendant transmitted Plaintiff's and Class Members' names and/or CID to third party Google as well as other unique identifiers to various other third parties for targeted advertising and other commercial purposes, as described herein.

160.     Defendant's use of Plaintiff's and Class Members' names and Private Information did not serve any public interest.

161.     The unlawful tracking of Plaintiff and Class Members' and disclosure of their names in connection with their Private Information has caused Plaintiff and Class Members to suffer damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiff and Class Members have also suffered nominal damages.

162.      Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed Tracking Tools onto its Website because the purpose of the Tracking Tools is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

163.     Because Defendant intentionally and willfully incorporated the Tracking Tools into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

164.     Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiff and Class Members are entitled to nominal damages.

165.     Plaintiff and Class Members are entitled to exemplary and/or punitive damages as a result of Defendant's knowing violations of their statutory rights to privacy.

166. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Google and other third parties and the wrongful disclosure of the information cannot be undone.

167. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Google who on information and belief continues to possess and utilize that information.

168. Plaintiff, on behalf of himself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into Plaintiff's and Class Members' statutory privacy interests.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

169. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

170. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information and compensation for their medical care.

171. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

172. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

173. Plaintiff and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

174. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information without consent to third parties like Google.

175. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

176. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

177. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

178. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

179. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

180.    Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

181.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

182.    The benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

**183.**    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

### COUNT VI
### NEGLIGENCE
### (On behalf of Plaintiff and the Class)

184.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

185.    Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

186.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

44

187. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

188. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

189. The third-party recipients include, but may not be limited to Google.

190. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

    d. General damages for invasion of their rights in an amount to be determined by a jury;

    e. Nominal damages for each independent violation;

    f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

    g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Edgar Pal individually and on behalf of the Class, prays for the following relief:

(a)      An order certifying the Class as defined above, appointing as the representative of the Class, and appointing his counsel as Class Counsel;

(b)      An order declaring that Defendant's actions, as set out above, violate the Federal Wiretap Act;

(c)      An injunction requiring Defendant to cease all unlawful activities;

(d)      An award of statutory damages, disgorgement of profits, costs, and attorneys' fees; and,

(e)      Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: February 3, 2026          Respectfully submitted,

By:    */s/ Gary M. Klinger*_____

Gary M. Klinger (IL Bar No. 6303726)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
Email: gklinger@milberg.com

Albert Plawinski (IL Bar No. 6327452)
**PLAWINSKI, PLLC**
2101 Pearl St.
Boulder, Colorado 80302
Tel: (303) 720-7095
Email: albert@plawinski.law

*Counsel for Plaintiff and the proposed Class*

47